Matthew M. Levy, J.
The New York Central Railroad Company seeks an order, pursuant to section 1450 of the Civil Practice Act, to compel the Erie Railroad Company to proceed to arbitration of a certain controversy in accordance with a clause allegedly providing therefor, contained in a trackage agreement made in 1897 between the petitioner’s predecessor company (hereinafter called Central) and the respondent (hereinafter called Erie).
*363 Under that contract, Erie was granted certain trackage rights and facilities in the operation of its trains upon Central’s tracks between Corning, New York, and Newberry Junction, Pennsylvania, in consideration for which Erie agreed to pay Central a specified percentage of Erie’s earnings resulting from the run in question. Erie agreed, too, that it would supply its own crew of classified employees in the operation involved. Somewhat more than a decade later — best fixed on this submission as 1909 — these jobs were, and have continued to be, filled by Central’s crewmen, with Erie paying the wages. There was no written agreement as to such new arrangement, and very little seems to be known in respect of it, except that it was a condition accepted by the parties in pursuance of a ruling of the engineers’ labor organization to the effect that this work-right belonged to the employees of Central.
In 1948 some of the conductors and brakemen employed by Central (117 in number) filed wage claims before the National Railroad Adjustment Board for time ‘ ‘ held-away-from-home terminal” while engaged in operating Erie’s trains on the Coming-Newberry Junction run. The claims were directed against Central and Erie was not permitted by the board to appear in opposition. On June 30, 1948, the board made an award in favor of the claimants, which Central paid. Subsequent thereto, additional claims (9181 in number) were filed by Central employees for somewhat similar relief. Payment thereof was discussed between Erie and Central. Central took the position that the previous award required payment of the later claims, even though they had not been before the board at the time it rendered the award. Erie objected to such payment and requested further action on the part of Central. Central rejected such procedure and voluntarily paid the claims, the sum eventually totaling $51,569.09. A bill for that amount was sent to Erie by Central in August, 1950. Payment thereof was refused by Erie. There was some effort at adjustment thereafter, particularly in the year 1952. The matter then became quiescent. However, some years later — February 25, 1957 — Central, in writing, made what it contends was a demand for arbitration. This demand was rejected by Erie in writing on May 3, 1957. On September 1, 1959 Central served the present petition to compel arbitration. Central claims the right to be reimbursed and urges that Erie’s disagreement as to that right comes within the purview of the 1897 agreement, which provides for arbitration in paragraph “ Ninth ” thereof as follows: “ In case of any disagreement between the parties hereto as to the true construction or meaning of any of the provisions of this *364 contract, or as to the rights of either party hereunder or any claim by either party arising hereunder, * * * such * * * matters of disagreement shall be submitted for arbitration to a tribunal consisting of three disinterested persons, constituted as hereinafter provided.”
The term of the 1897 contract was to expire June 30, 1903, but apparently it has been continued in force and effect without written stipulations therefor until the present time. The continued existence of the agreement is conceded by Erie. Erie’s opposition to arbitration is principally upon two grounds — that the matter in dispute does not come within the scope of the arbitration clause contained in the contract, and that, even if it did, Central’s demand for arbitration is not timely.
In support of its first contention, Erie points out that the operation of Erie’s trains by Central’s crewmen on the particular trackage involved and the payment of the crewmen’s wages were not provided by the specific terms of the contract in question, but by an “ unwritten agreement ” separate from and long subsequent to the original contract, and that no provision for arbitration was provided therefor — and hence the dispute is not governed by the arbitration clause. In support of its argument on this point, Erie presents a number of general legal precepts: The party petitioning the court for an order to compel arbitration has the burden of proving that a contract exists clearly calling for arbitration of the particular disagreement submitted (Matter of Layton-Blumenthal, Inc. [Wassermon Co.], 280 App. Div. 135). No one is under a duty to arbitrate unless by clear language he has agreed to do so. It is not enough to establish the existence of any agreement to arbitrate; the contract must be to arbitrate the precise matters as to which the arbitration is sought (Matter of Lehman v. Ostrovsky, 264 N. Y. 130, 132; Matter of Eagar Constr. Corp. [Ward Foundation Corp.], 255 App. Div. 291). One cannot be directed to arbitrate unless it is found that the parties have agreed to arbitrate (Matter of Spectrum Fabrics Corp. [Main St. Fashions], 285 App. Div. 710, affd. 309 N. Y. 709). The court cannot impose such an agreement upon the parties (Matter of Kallus [Ideal Novelty & Toy Co.], 292 N. Y. 459).
I go along with the propositions of law as thus generally stated by Erie. It is when they are sought to be applied to the facts in the instant case that difficulties are encountered. Some of these I shall now consider.
The modification with respect to the use of Central’s instead of Erie’s employees is referred to by Erie as an “ unwritten agreement ”. There is no basis for this appellation. In the *365 first place, there is no proof before me sufficient even to warrant a hearing on the claimed issue as to whether there was an oral contract in 1909, as asserted by Erie. Of course, if in fact there were such a later separate and distinct agreement between the parties, entirely unrelated to the contract of 1897 the arbitration clause contained in the first contract would not, without adequate reference or incorporation, be held to apply to controversies arising under the second contract (see Kramer v. Dreyfus & Co., 25 Misc 2d 594). But that is not this case. Who should do the work on the Corning-Newberry Junction run was expressly provided for in the Trackage Agreement. It was there provided that the work was to be done by the Erie employees. Since, for whatever reason, the work was undertaken thereafter by the Central employees, the only question here involved is which contracting party was to pay for the services of such employees. For the answer to that question we must look to the basic agreement. That agreement— although of comparatively ancient vintage — is concededly in full force and effect. Therefore, any accepted performance thereof which deviates from its written provisions is, nevertheless, a performance under that agreement. The jurisdictional issue as to which personnel should thereafter perform the services on this run — and as to who should pay therefor— was not unrelated to the written provisions in the 1897 Track-age Agreement. I cannot, upon this submission, agree to the thesis that the fact that there was a switch of crewmen constitutes a different agreement, rather than only a modification as to performance by action and acceptance. I hold, therefore, that the basic 1897 agreement still pertains and that it embraces the matters here involved. The only sense in which what was done in 1909 was a contract is that it involved an agreement to accept performance under the contract in a mode other than as written in the contract. Viewed in that light, it is clear that the resolution of the controversy is one for the arbitral tribunal as set up in the agreement (Matter of Lipman [Haeuser Shellac Co.], 289 N. Y. 76, motion for rearg. denied 289 N. Y. 647; see Matter of Minkin [Halperin], 279 App. Div. 226, affd. 304 N. Y. 617; Matter of Potter Co. [Miles Metal Corp.], 2 Misc 2d 515, 517, affd. 2 A D 2d 816).
So, also, the impact of the award of the National Railroad Adjustment Board — whatever it may be — would involve only its interpretation and applicability against the backdrop of the 1897 agreement as construed. The board’s decision created no new relationship. That only Central and not Erie was permitted to oppose the initial claims before the board is irrele *366 vant to a disposition of the issue before me. And the board’s holding that the 1897 Trackage Agreement “ has no bearing on the employees of the New York Central Railroad Company,” is not binding upon me in any way in determining the question as to whether an arbitrable dispute here exists.
The arbitration clause is expressed in sweeping terms, covering ‘ ‘ any disagreement between the parties hereto as to the true construction or meaning of any of the provisions of this contract, or as to the rights of either party hereunder, or any claim by either party arising hereunder.” While there is no question in my mind that this clause, all-inclusive as it is, applies to the present situation (Matter of Lipman [Haeuser Shellac Co.], 289 N. Y. 76, 80, motion for rearg. denied 289 N. Y. 647, supra; Matter of Bohlinger [National Cash Register Co.], 305 N. Y. 539; Matter of Morgan Guar. Trust Co. v. Wasserman, 10 A D 2d 278, 282), I must nevertheless deny Central’s application to direct Erie to arbitrate. For, while I am of the view that Erie’s first contention — that the present dispute does not arise under the Trackage Agreement — is fallacious, I find that Erie’s further argument — that Central’s demand for arbitration was untimely — is valid, both on the equitable principle of laches and by the express provisions of statute. This state of affairs warrants a short review of the facts on this issue:
Payment was made by Central to the first group of crewmen in 1948, pursuant to the award of the National Railroad Adjustment Board. Involved in the present controversy is the second batch of claims, which were paid by Central over Erie’s objection. Central’s demand upon Erie for reimbursement therefor was made in August, 1950. Consequently, it was then, at the latest, that Central had its claim. Central asserts that there were prolonged discussions between the parties during the period from 1948 to 1952, and that, in 1952, an arrangement was made to submit the matter to one Swacker as sole arbitrator, but that before this procedure was finalized, Swacker died (sometime late in 1952). It is further stated by Central that negotiations continued through 1953 and into 1954, but that efforts in that behalf ceased, after a change in management and legal staff, without protest from Erie or without any time limitation being placed thereon. Erie does not deny the discussions, but does deny that any arrangements for arbitration were made in pursuance of the 1897 contract or otherwise, and no written agreement or submission was entered into after that date. On February 25, 1957 Central wrote Erie, seeking to reopen negotiations for settlement or arbitration. Erie’s *367 response on May 3, 1957 was entirely negative — Erie refused to make an adjustment, disavowed the alleged arrangement to arbitrate, and rejected any such proposal. Nevertheless, it was not until September, 1959 that legal proceedings were begun by Central to compel arbitration. In the meanwhile, four of the Erie executives having knowledge of the facts died and two others were retired for age and left the jurisdiction.
Erie has taken pains to point out that it does not claim that Central has waived its rights to, or is estopped from asking for, arbitration in the sense that “ Waiver is [the] ‘ voluntary and intentional relinquishment or abandonment of a known existing legal right ’ ” (Davison v. Klaess, 280 N. Y. 252, 261; Sillman v. Twentieth Century-Fox Film Corp., 3 N Y 2d 395, 403) or in the sense that Central has spoken or acted in a manner which induced Erie to change its position with respect to the controversy involved here (Triple Cities Constr. Co. v. Maryland Cas. Co., 4 N Y 2d 443, 448-450; Lynn v. Lynn, 302 N. Y. 193, cert, denied 342 U. S. 849). Erie contends simply that Central’s present application is barred by laches — an inexcusable delay with intervening prejudice to Erie.
Let me say at this point that Central’s attempt to shift to Erie the onus of inaction cannot succeed. As I have had occasion to note elsewhere, “ the offensive in instituting proceedings for arbitration lies with the aggrieved party ” (Klein Coat Corp. v. Peretz, 4 Misc 2d 341, 345). In the case at bar, Central, as the aggrieved party, could not impose upon Erie the burden of setting the arbitration machinery in motion (Guerra v. Krueger Corp., 4 Misc 2d 696, 697).
The Arbitration Law was enacted to facilitate the settlement of disagreements, to expedite their disposition and to avoid the delay inherent in litigation (Matter of Zimmerman v. Cohen, 236 N. Y. 15, 21; Matter of Gera Fabrics [Liberty Fabrics of N. Y.], 14 Misc 2d 489, affd. 6 A D 2d 1001). “ But the Arbitration Law contemplates prompt action and too long a delay in seeking appropriate relief may be easily construed as an indication that this claim is waived ” (Nagy v. Arcas Brass & Iron Co., 242 N. Y. 97, 99). But the question remains whether the issue of laches is for the arbitral or judicial tribunal to resolve.
By way of analogy, I may say that while, under some circumstances, an issue of waiver is for the arbitrators to determine (Klein Coat Corp. v. Peretz, 4 Misc 2d 341, supra), under others, it is for the court (Matter of Amtorg Trading Corp. [Camden Fibre Mills], 304 N. Y. 519, 521). It is my opinion (although *368 there is no precise precedent which I may cite in accord)* that, in an appropriate factual situation, whether or not laches is a bar to an application to compel arbitration in pursuance of a contract is for the court to resolve at the outset, and not for the arbitrators after a judicial direction that the parties proceed to arbitration. Proceedings to compel arbitration — like actions to compel specific performance of any contract — are equitable in nature (Matter of Marchant v. Mead-Morrison Mfg. Co., 252 N. Y. 284, 293; Matter of Lipschutz [Gutwirth], 304 N. Y. 58, 61) and laches is traditionally a defense to the specific enforcement of any contract (Groesbeck v. Morgan, 206 N. Y. 385, 389; City of New York v. New York Cent. R. R. Co., 275 N. Y. 287, 293). In my view, an agreement to arbitrate — as in the case of any other agreement — may not be enforced if a legal or equitable defense exists which would bar specific performance of the contract in that respect (cf. Matter of Feuer Transp. [Local Union No. 445], 295 N. Y. 87, 91-92). I hold that Central’s extraordinary and unjustified delay in instituting proceedings, as provided by statute, to compel Erie to arbitrate, coupled with the resulting prejudice to Erie, is a bar to Central’s present application (cf. Marcus v. Village of Mamaroneck, 283 N. Y. 325; Feldman v. Metropolitan Life Ins. Co., 259 App. Div. 123).
Whatever reticence there may have been on my part, because of the absence of precedent or otherwise, in arriving at a holding that laches is a bar here in limine as a matter of equitable precept, all doubt was resolved for me by the legislative enactment, effective September 1, 1959, of section 1458-a of the Civil Practice Act, the relevant portion of which reads as follows: ‘ ‘ A motion to compel arbitration shall be denied, and a motion to stay arbitration granted, if at the time of the giving of notice of intention to arbitrate, or of the making of a demand for arbitration, the claim sought to be arbitrated would be barred by an existing statute of limitations if such claim were asserted in an action in a court of this state.”
If the present claim were asserted by Central in an action at law, it would, as a result of the impact of this statute, be barred by the six-year Statute of Limitations applicable to contractual *369 claims (Civ. Prac. Act, § 48, subd. 1). But, on the basis of the several additional issues raised by the court for reargument, Central, the petitioner, pleads the inapplicability of section 1458-a upon several grounds. Each of these contentions will now be considered.
(1) Since this controversy arose long prior to the enactment of the section in 1959, Central contends that the provisions of the statute do not govern. I disagree, as a matter of law.
Doubtless, as urged by the petitioner, the usual Statute of Limitations goes directly to a right recognized at common law (e.g., liability for breach of contract); in consequence, if retroactively applied, destruction would result of a property right which accrued before passage of the statute. Such legislation, therefore, is ordinarily viewed as prospective in effect (Kelly v. Yannotti, 4 N Y 2d 603, 606; see People v. Oliver, 1 N Y 2d 152, 157-158). But that is irrelevant in considering whether section 1458-a governs controversies arising prior to or existing at the time of its enactment. This statute does not destroy a right. True, it does render a promise to arbitrate unenforcible; but such a promise of itself creates no rights. For arbitration 11 is not a definition of the rights and wrongs out of which differences grow.” [It] “is a form of procedure whereby differences may be settled” (Matter of Berkovitz v. Arbib & Houlberg, Inc., 230 N. Y. 261, 270; see, also, Garrity v. Bagold Corp., 267 App. Div. 353, 355).
The common law did not recognize the remedy of arbitration. A promise to arbitrate was, therefore, unenforcible prior to the enactment of the Arbitration Law (Haggart v. Morgan, 5 N. Y. 422; Seward v. City of Rochester, 109 N. Y. 164; Meacham v. Jamestown, Franklin & Clearfield R. R. Co., 211 N. Y. 346). The Arbitration Law itself (Civ. Prac. Act, art. 84) was and is a wholly remedial statute and did no more than make promises to arbitrate, under certain prescribed conditions, specifically enforcible in our courts (Matter of Berkovitz v. Arbib & Houlberg, Inc., 230 N. Y. 261, supra; Matter of Marchant v. Mead-Morrison Mfg. Co., 252 N. Y. 284, 293, supra; Matter of Lipschutz [Gutwirth], 304 N. Y. 58, 61, supra). The Arbitration Law is, in short, part of the law of remedies, and its effect and application must be measured accordingly.
Traditionally, legislation pertaining to remedies normally has retroactive effect — unless, of course, therein specified to the contrary (Laird v. Carton, 196 N. Y. 169; Myer v. Myer, 271 App. Div. 465, affd. 296 N. Y. 979). Accordingly, the Arbitration Law (together with the amendments thereto) is applicable to pre-existing contracts (Matter of Berkovitz v. *370 Arbib & Houlberg, Inc., 230 N. Y. 261, 269-272, supra; Matter of Kahn [National City Bank of N. Y.], 284 N. Y. 515, 521-523). Indeed, since the contract upon which the petitioner relies in the instant case was made in 1897 — long prior to the enactment of the Arbitration Law (L. 1920, ch. 275) — unless that law be held to establish a remedy rather than create a right, the petitioner would be hoist with its own petard and would not, in any event, be entitled to a judicial direction that the respondent arbitrate under the provisions for arbitration contained in the contract relied upon by the petitioner to obtain that relief. I hold, therefore, as I have said, that section 1458-a clearly applies to this case and bars enforcement of the arbitration clause (cf. Matter of Plastic Molded Arts Corp. [A & H Doll Mfg. Corp.], 23 Misc 2d 839, 841, affd. 11 A D 2d 668, where it was held that as section 1458-a ‘1 merely codified and clarified the existing common law * * * that arbitrators could not consider issues barred by limitations * * * [t]he statute therefore is controlling ”).
(2) Since the negotiations between the parties during the period from 1950 to 1952, had culminated in October, 1952 in a notice of intention to arbitrate, which Central had given to Erie and to which Erie had consented, Central contends that section 1458-a is not a bar to this proceeding. I do not agree that the papers presented to me support the assertions made as to the facts.
Central’s argument on this point may be summarized thus: It concedes in effect that, since a demand was made by it in August, 1950 for reimbursement of the wages in issue, the Statute of Limitations commenced to run upon its claim from that date. But Central alleges that the statute was tolled by an agreement to arbitrate or by a submission to arbitration in October, 1952, that the death of the agreed-upon arbitrator prevented the continuance of the arbitration, that the arrangement was not repudiated by Erie until May, 1957, that there would thus be a suspension of the statute for a period of more than four years, and (the action having accrued in August, 1950) that the time to commence this proceeding to compel arbitration had not expired by September 1, 1959, the date when the present court proceeding was instituted.
Arbitration is a special proceeding (Civ. Prac. Act, § 1459). A demand or notice of intention to arbitrate is not required under section 1450 of the Civil Practice Act, where provision is made for a petition to the court for an order directing that arbitration proceed as agreed to by way of contract or submission. When that section is invoked, the proceeding is com *371 menced by the service of the petition (Matter of Katz [Burkin], 1 Misc 2d 67, 70). On the other hand, when a notice of intention to arbitrate is served, that notice is deemed the commencement of the special proceeding — not the usual motion that ensues seeking an order requiring the unwilling party to proceed to arbitration (§ 1450) or the equally usual motion made in which an order is sought by the latter to stay the arbitration (§ 1451). In such case, the motion is deemed an application in an already existing special proceeding commenced by the service of the notice of intention to arbitrate (Matter of Grand Cent. Theatre v. Moving Picture Mach. Operators Union, 69 N. Y. S. 2d 115, affd. 263 App. Div. 989).
If, therefore, there were any proof here that there was in fact a notice of intention to arbitrate under the 1897 Trackage Agreement, or indeed if there was an accepted demand for, or submission to, arbitration thereunder, it might, perhaps, be validly urged that the statute would not be a bar. Central claims such acceptance was made in 1952 and repudiated by Erie in 1957. But there is no sufficient showing in this record that there was an intervening arrangement which would toll the statute, even if such agreement can be said to be in accordance with the 1897 contract. What occurred between the parties after Erie had, in 1950, rejected Central’s request to be reimbursed for the payment made to the crewmen in 1948, is not fully shown in the papers presented to me, and, except for the little and conflicting information that may be gathered from the subsequent communications, is left to conjecture. Some bare statements are made on information and belief, but they are unsupported by any facts or evidence and are in the main unsubstantiated in any way. As I have noted in my earlier narration of the facts, Erie does not dispute that discussions were had, but it denies any arrangement or agreement to submit to arbitration. Concededly, no formal notice was served upon Erie, and no written consent thereto was obtained; and it is undisputed that the arbitration alleged to have been agreed upon was not proceeded with. It seems to me that the fact is that the arrangement for the one-man tribunal was not completed when the named arbitrator died. As I read the papers, the project appears to have been in the stage of preliminary negotiation only.
The parties could, of course, agree to arbitrate an existing dispute, regardless of whether or not they had previously generally contracted for arbitration. And I may assume that some agreement for arbitration was entered into to decide the disagreement arising subsequent to the Railroad Adjustment *372 Board’s award. Indeed, the letter of the respondent dated May 3, 1957, relied upon by the petitioner, lends credence to the view that any arrangement to settle the dispute during the period from 1948 to 1952 was as a result of an attempted independent submission of the specific controversy rather than under the general arbitration machinery established in the 1897 contract. That is the most that can be gleaned from this record in Central’s favor on this point. It is significant that, under the 1897 contract, three arbitrators were to be chosen, and that the claimed 1952 plan was for one arbitrator. Such a specific agreement would be enforced, provided it was in writing in accordance with the requirements of the statute (Civ. Prac. Act, § 1448) and one of the parties reneged (Matter of Bullard v. Grace Co., 240 N. Y. 388). But Central failed to go forward after the death of the person named as the arbitrator. And the present proceeding by Central, instituted years later, is not one to enforce that alleged disposition, but is a proceeding to compel arbitration in accordance with the contract of 1897.
(3) Since, on February 25, 1957, Central “made a [due written] demand for arbitration ’ ’, Central contends that the statute does not apply or has been duly complied with. I am not in accord.
In its letter of February 25, 1957 Central, after reciting its views as to the status of the long dormant dispute, wrote to Erie: “ Naturally, if the controversy can be disposed of amicably, it is my opinion that this would be preferable to engaging in an arbitration. However, if this does not meet with your approval, I would appreciate it if you would designate someone of your staff to meet with Mr. Thomas M. Healy of my office to discuss the initiation of an arbitration proceeding ”. This letter, signed by Central’s General Attorney, was sent to Erie’s General Counsel, and stated further that ‘ ‘ I have been instructed by the officials of my Company to dispose of this matter and I would appreciate your views ”. On May 3, 1957 Erie replied in substance that the matter in issue was not one for settlement or arbitration.
At the time Central’s “ notice ” or “ demand ” for arbitration was transmitted to Erie, in February 1957, the six-year Statute of Limitations had already barred the underlying claim, which arose at the latest in August, 1950. Moreover, while subdivision 2 of section 1458 of the Civil Practice Act authorizes the institution of an arbitration proceeding by the service of a notice of intention to conduct it, such notice must state, in substance, the necessary elements specified in the section (Schafran & Finkel, v. Lowenstein & Sons, 280 N. Y. 164, motion for *373 rearg. denied 280 N. Y. 687). One of these specifications is that the protagonist seeking arbitration must inform his adversary in the notice ‘ ‘ that unless within ten days after its service, the party served therewith shall serve a notice of motion to stay the arbitration, he shall thereafter be barred from putting in issue the making of the contract or submission or the failure to comply therewith ”. Central’s communication of February 25,1957 does not contain such caveat in words or substance. It is patent that the letter was in no way intended to be, nor was it, in compliance with the requirements of the statute.
I, too, urged the parties to negotiate an amicable disposition by settlement or arbitration, and conferences were held in that behalf after the submission of this matter to me. But these negotiations proved entirely abortive. The issues remained, therefore, for judicial determination. On the law and the facts, the application of the petitioner for an order directing the respondent to proceed to arbitration of the controversy referred to is denied. An order has been signed and entered accordingly. Needless to say, this decision applies to the dispute specifically involved, and does not in any way refer to or affect any other differences between the parties, some of which have been mentioned in the communications sent to me by respective counsel.

 In Lumsden v. Lumsden Bros. & Taylor, Inc. (242 App. Div. 852) the court said, by way of dictum: “If the respondent had a valid arbitration agreement, his remedy is prescribed in sections 3 and 5 of the Arbitration Law, and long ago he should have made a motion to direct that the arbitration proceed and to stay this action. That remedy is still open to him unless he has waived it or is guilty of laches”. (Italics supplied. See, also, Matter of Bel-Rose Fashions v. Braunheim, 25 Misc 2d 1037.)